IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NANCY K. McCALEB, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COMMISSIONER OF SOCIAL SECURITY, )<br>)<br>Defendant. ) | Case No. 3:05-cv-715-DGW |

**MEMORANDUM AND ORDER**

This matter is before the Court on the Petition for Review of the Commissioner's Decision Denying Benefits (entitled "Plaintiff's Brief") filed by the Plaintiff, Nancy K. McCaleb, on March 16, 2006 (Doc. 19). For the reasons set forth below, and after a review of the record, the Commissioner's decision denying benefits is **REVERSED** and **REMANDED** for proceedings consistent with this Order.

### BACKGROUND

**Procedural History**

The Plaintiff, Nancy K. McCaleb, filed applications for Disability Insurance Benefits and Supplemental Security Income on June 12, 2003, alleging on an onset date of July 16, 2002 (Tr. 52-54). The claim was initially denied on October 24, 2003 (Tr. 380), and again denied upon reconsideration on December 23, 2003 (Tr. 385). Upon request, a hearing was held on March 7, 2005 (Tr. 399). On May 18, 2005, Administrative Law Judge ("ALJ") Anne C. Pritchett issued a decision denying benefits (Tr. 15-23). The Appeals Council denied Plaintiff's request for review on August 17, 2005 (Tr. 6).

**Medical History**

At the time of ALJ Pritchett's opinion, Plaintiff was fifty-three years old and alleged that she was disabled due to multiple mental and physical impairments (Tr. 16). The physical impairments alleged include internal hemorrhoids, mild chronic colitis, mild chronic gastritis, Type II diabetes, hypothyroidism, migraine headaches, sciatica, painful feet, and fibromyalgia. She alleged multiple visual impairments including cataracts, hypertensive retinopathy, and "tunnel vision." Plaintiff also claimed she suffered from restless leg syndrome (affecting her sleep), wrist, knee, abdominal, breast, and chest pain. The mental impairments alleged included dysthemia (chronic depression), and bipolar disorder.

Plaintiff's primary care physician since 1991 is Dr. Dale Blaise (Tr. 350). Two of his reports containing assessments of the Plaintiff's limitations are at issue in this appeal. The first report, dated June 18, 2003, states that Plaintiff's capacity to walk, bend, stand, sit, turn climb, push, and pull was reduced by up to twenty percent; that there was a twenty percent reduction in her ability to stoop; and that her ability to perform daily living activities was reduced by up to twenty percent (Tr. 220). He found no impairment in Plaintiff's fine or gross motor skills (Tr. 220).

Shortly after this report, Dr. Blaise listed all of Plaintiff's health problems in a letter dated August 12, 2003: cataracts and loss of peripheral vision, restless leg syndrome, insomnia and narcolplexy (sic), diabetes, depression and anxiety (for which she was receiving medication), hypertension, irritable bowel syndrome, acid reflux, arthritis, TMJ, hypothyroidism, migraines, foot problems, and a pinched sciatic nerve (Tr. 222). The doctor went on to state in the letter that the combination of all of her problems, her sleep disorder, and her medications made it

impossible for her to maintain a work schedule and to drive safely (Tr. 222). This was not the first time, however, that her ability to drive became an issue. On July 15, 2002, Dr. Blaise wrote a note to Plaintiff's employer stating that Plaintiff should not drive until her sleep disorder was evaluated (Tr. 227). A month and a half later, on August 28, 2002, Dr. Blaise, at Plaintiff's request, wrote a note saying that Plaintiff could drive again (Tr. 225).

    Dr. Blaise's notes, test results, and labs appear to substantiate many of the listed impairments on Dr. Blaise's August 12, 2003 letter, as do the conclusions of other doctors who saw Plaintiff. Dr. Michealis Jackson examined Plaintiff on November 9, 2001, and found that she had incipient cataracts that did not require surgery (Tr. 159). John Sellhorst, M.D., examined Plaintiff on July 23, 2002, and found that she suffered peripheral vision loss due to non-pathological factors (Tr. 162). Dr. Sellhorst, therefore, suggested the need for counseling as he believed that her functional vision loss was most likely caused by stress (Tr. 162). Plaintiff's diagnosis of restless leg syndrome was based on a sleep study conducted at St. Joseph Memorial Hospital's Sleep Disorder Center on June 14, 2002 (Tr. 232). Further, Dr. Blaise's notes detail ongoing treatment of Plaintiff's diabetes and hypothyroidism, and hypertension – all of which were treated with medication (Tr. 234-57). Dr. Blaise also referred Plaintiff to a podiatrist on December 12, 2001, after finding evidence of an in-grown toe nail, which caused bilateral foot pain (Tr. 238).

    Dr. Blaise's second evaluation of Plaintiff's limitations, dated February 22, 2005, listed Plaintiff's impairments as hypothyroidism, hypertension, diabetes, restless leg syndrome, bipolar disorder, and fibromyalgia (Tr. 350). Out of an eight-hour workday, Dr. Blaise estimated that she could only work for one to two hours (Tr. 351). This included sitting for a maximum of forty-five minutes at a time and standing for a maximum of forty-five minutes at a time and

occasional lifting of ten to twenty pounds (Tr. 351).  He also stated that Plaintiff would need to lie down or recline for twenty minutes every hour in order to complete a full eight-hour work day (Tr. 351).

Dr. Blaise's diagnosis of fibromyalgia appears to stem from Plaintiff's visits at the Cedar Court Community Clinic where "? fibromyalgia"[1] had been written several times on reports dated July 12, 2004, and August 12, 2004 (Tr. 326-30).  Dr. Blaise first mentioned fibromyalgia in on November 23, 2004, when he stated: "she is having fibromyalgia exacerbation with spasms in the muscles in the shoulders and neck.  She was wondering about getting an injection." (Tr. 360).  In response, Dr. Blaise gave her an "injection of 1 cc of Decodron and 1 cc of Decodron LA and Xylocaine in the upper back and shoulders for muscle spasms and trigger points." (Tr. 360).  Fibromyalgia is defined as "a common nonarticular disorder of unknown cause characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues.  Diagnosis is clinical.  Treatment includes exercise, local heat, and drugs for pain and sleep." THE MERCK MANUAL 321 (18th ed. 2006).  The Merck Manual further states:

> Fibromyalgia is suspected in patients with generalized pain and tenderness, especially disproportionate to the physical findings; with negative laboratory results despite widespread symptoms; or when fatigue is the predominant symptom.  Tests should include ESR or C-reactive protein, CK and probably screens for hypothyroidism and hepatitis C (which can cause similar symptoms). The diagnosis is supported by explicit tender points and other findings which comprise diagnostic criteria.  Patients meeting some, but not all, criteria may still have fibromyalgia.  Chronic fatigue syndrome can cause similar generalized myalgias.  Polymyalgia rheumatica can cause generalized myalgias, particularly in older adults but tends to affect proximal muscles selectively and produce a high ESR.

Id.

---

[1] See transcript page 327, where it reads, under Assessment/Plan/Education: "(2) ? Fibromalgia → Pt ready to [remainder is illegible]."

Several of Plaintiff's mental health evaluations are also at issue in this appeal. Brenda O. Gilbert, Ph.D. and Cathy Brock, M.A. saw the Plaintiff twenty-nine times between February 18, 2004, and March 2, 2005 (Tr. 347, 376). Their diagnosis was "296.89 Bipolar II Disorder." (Tr. 376). The treatment summary provided by Dr. Gilbert and Dr. Brock was unaccompanied by any treatment notes. Dr. Brock also completed a questionnaire regarding Plaintiff's diagnosis of Bipolar Disorder (Tr. 347-50). Dr. Brock indicated marked limitations in the areas of activities of daily living and in maintaining social functioning (Tr. 347). She specified that Plaintiff presently experienced deficiencies of concentration, persistence, or pace, and had repeated episodes of deterioration or decompensation in work or work-like settings (Tr. 347). Her report also indicated that Plaintiff was moderately to extremely impaired in almost all of the listed work-related limitations related to the psychiatric state listed on the form (Tr. 348).

Plaintiff was initially referred to Dr. Gilbert and Dr. Brock by James Peterson, Ph.D. (Tr. 376). Before she referred Plaintiff to Dr. Gilbert and Dr. Brock, Dr. Peterson performed a one-hour consultive examination of Plaintiff on September 16, 2003 (Tr. 294). He made several observations of Plaintiff apart from her self-described personal history and mental status. He stated that Plaintiff was "appropriately groomed and attired for the evaluation" and "walked to and from the testing site without difficulty or assistance" (Tr. 294). He also found that a mental status exam showed her to be "alert" and "lucid," her eye contact "appropriate," and her speech "normal" (Tr. 296). Plaintiff was "oriented as to time, place, and person," and she knew the route from the doctor's office to her home, but was confused about the distance (Tr. 296-97). Finally, he stated that "she appears to be quite depressed, reclusive and is yet clear minded and well oriented. She was cooperative throughout the evaluation." (Tr. 297). His diagnosis was "Axis I 3004 Dysthemia." (Tr. 297).

M.A. Wharton, Psy.D., also examined Plaintiff on October 13, 2003, in order to make a functional capacity assessment for the state agency (Tr. 108-15). Dr. Wharton found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, ask simple questions or request assistance, accept instructions, and respond appropriately to criticism from supervisors (Tr. 108-09). He explained:

> [Plaintiff's] cognitive and attentional skills are intact and adequate for simple one-two step work tasks. [Client] carries out a fair set of [activities of daily living] with some limitation secondary to general medical condition. Performs reasonably well on cognitive tasks on MSE. Depressive symptoms associated with medical/physical problems moderately limit ability to carry out detailed tasks. Interpersonal skills are appropriate in clinical interview. [Client] describes self as somewhat socially withdrawn. Recommend moderate limitation of social expectations.

(Tr. 110). Dr. Wharton's notes listed Plaintiff's diagnoses, Dr. Peterson's findings, and Plaintiff's August 18, 2003 Daily Activities Questionnaire as sources for his report (Tr. 110).

On March 7, 2005, the ALJ held a hearing regarding Plaintiff's application. At this hearing, the ALJ elicited testimony from Shawn Elder, a vocational expert. After questioning the vocational expert about the skill level and the types and transferability of skills from Plaintiff's previous jobs, the ALJ asked the following hypothetical:

> Please assume a person of the Claimant's age, education, and work background who can perform light work, and, by that, I mean the individual can lift 20 pounds occasionally, 10 pounds frequently, this is a limited range of light. This individual can stand up to four hours a day, sit four hours a day, with the position being at the discretion of the worker. This individual can perform postural activities occasionally. And this individual is capable of semiskilled work. Would the work of substance abuse worker be available for this person?

(Tr. 444). The vocational expert answered in the affirmative (Tr. 444). The vocational expert indicated numerous other jobs that were available based on the hypothetical above. He also

6

found that jobs were available under other hypotheticals that involved combinations of skilled/unskilled and light/sedentary work (Tr. 444-46). Then, the following exchange occurred:

> ALJ: And if you assume I find Claimant's testimony totally credible and all impairments described as supported by substantial medical evidence, would there be any jobs a person with those limitations could perform?
> VE: No, Your Honor.
> ALJ: Okay. And your rationale?
> VE: Her inability to stay focused, memory problems, her rapid cycling with her moods would, I think, create situations of inappropriate behavior to co-workers and public. Her inability to tolerate standing more than 15 minutes or walking, I think she also has stated she has problems sitting. Probably most importantly is her fatigue, her tiredness, sleepy all the time.

(Tr. at 446).

In her findings, the ALJ determined that Plaintiff was "capable of performing semi-skilled work." (Tr. at 23). She found that Plaintiff's residual functional capacity did not preclude her from performing her past relevant work as a substance abuse worker (Tr. at 23). The ALJ also stated that the Plaintiff's medically determinable psychologically impaired visual perception, chondromalacia of the left knee, and depression did not prevent her from performing her past relevant work.

## DISCUSSION

**Standard of Review**

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive. . . ."); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001); See also White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (stating that "the reviewing court is not allowed to substitute its judgment for the

ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility") (quotation marks and citation omitted).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  42 U.S.C. § 405(g); Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  But "the decision cannot stand if it lacks evidentiary support or adequate discussion of the issues." Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  In addition, when denying benefits, an ALJ must build "an accurate and logical bridge from the evidence to his conclusion." Lopez, 336 F.3d at 539 (quoting Clifford, 227 F.3d at 872).

Supplemental insurance benefits are available only to those individuals who can establish a "disability" under the terms of the Social Security Act. 42 U.S.C. § 423(d).  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 416.920(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . .

physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. § 416.920(e). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

**Weighing of Medical Opinion Evidence**

Plaintiff initially alleges that the ALJ erred in her assessment of Plaintiff's mental assessment. Specifically, she disputes the ALJ's weighing of the medical opinion evidence. The ALJ granted "no weight" to the opinion of Plaintiff's treating source – Dr. Gilbert (Tr. 21). The ALJ granted only "slight weight" to the opinion of the state agency medical reviewer, Dr. Wharton (Tr. 21). Finally, the ALJ appeared to grant controlling weight to the opinion of the consulting source – Dr. Peterson. See Tr. at 21 ("The evaluation by Dr. Peterson indicates the claimant should be able to perform semi-skilled work."). In discounting the opinions of Dr. Gilbert and Dr. Wharton, the ALJ stressed that their statements lacked objective supporting evidence and their opinions were inconsistent with other contradictory evidence in the record (Tr. at 21).

In determining whether the ALJ erred, this Court first notes that "weighing conflicting evidence is what the ALJ is required to do." Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). Further, this court "may not re-weigh the evidence." Id. The Regulations provide detailed guidelines on how to weigh medical opinions. 20 C.F.R. § 404.1527(d) (2006). In weighing medical opinions, the ALJ must consider several factors. The ALJ "generally" gives more weight to those opinions of examining and treating sources rather than non-examining, non-treating sources. More weight is also accorded to opinions that are consistent with the record as a whole, and supported by relevant evidence, "particularly medical signs and laboratory findings." 20 C.F.R. § 404.1527(d). Controlling weight will be accorded to a treating source opinion on the issues of nature and severity of the impairment when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.§ 404.1527(d). If the opinion fails to meet this standard, however, the ALJ may discount the physician's opinions because "a claimant is not entitled to disability insurance benefits simply because her physician states that she is 'disabled' or unable to work." Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). The regulations also state:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can *reasonably be accepted as consistent with the objective medical evidence* and other evidence. By objective medical evidence, we mean medical signs and laboratory findings . . . .

20 C.F.R. 404.1529 (a) (2006) (emphasis added). The regulations define signs as "anatomical, physiological, or psychological abnormalities which can be observed, apart from [the client's] statements." 20 C.F.R. § 404.1528(b) (2006). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." 20 C.F.R. § 404.1528(c) (2006).

10

On the basis of the evidence available, the ALJ's determination to give Dr. Gilbert's testimony no weight is supported by substantial evidence in the record.  Because Dr. Gilbert did not provide any objective evidence - signs or laboratory findings – about how she made her diagnosis of bipolar disorder, her opinion was completely unsupported, much less "well supported."  Other objective evidence in the record also was at odds with Dr. Gilbert's opinion.  Dr. Peterson's observations that Plaintiff was "clear-minded," "well-oriented," "alert," and "lucid," contradict Dr. Gilbert's naked conclusions that Plaintiff had difficulties with concentration, persistence and pace, or had reduced work functioning due to her mental disorder.  On this record, the ALJ need not have given Dr. Gilbert's evidence controlling weight under the regulations; however, this Court must remand with instructions to further develop the record by obtaining the treatment notes and any other medical records from Dr. Gilbert.

In determining that Dr. Gilbert's opinion was unsupported by objective evidence, the ALJ stated that "Dr. Gilbert has chosen not to provide any office visit notes or evaluations." (Tr. 21).  Even so, the ALJ erred by not further developing the record in this regard. Barnett v. Barnhart, 381 F.3d 664 (7th Cir. 2004) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.");  See also, Smith v. Apfel, 231 F.3d 433, 437-38 (7th Cir. 2000) (finding that ALJ has a duty to develop the record where treating physician's testimony was not given controlling weight); S.S.R. 96-2p at 4 ("In some instances, additional development required by a case—for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record."); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)

11

("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."). The regulations state: "we are responsible for developing your complete medical history, including . . . making every reasonable effort to help you get medical reports from your own medical sources." 20 C.F.R. § 404.1545(a)(3).

Clearly, if Dr. Gilbert's opinion evidence had been "well supported" by objective evidence, it should have been given controlling weight under 20 C.F.R. § 404.1527(d)(2). Dr. Gilbert, in seeing Plaintiff twenty-nine times, was in the best position to evaluate her mental condition. Further, an objectively-verified diagnosis of bipolar disorder would not be inconsistent with the substantial evidence in the record due to the manic – depressive episodic nature of Bipolar II disorder. See DSM-IV-TR Manual 392-397 (4th ed. 2000).

Although not completely barren of objective evidence, Dr. Wharton's report is similarly lacking in signs and laboratory findings. Further, most of the objective evidence he presented actually gave support to the ALJ's determination. His observations that Plaintiff's cognitive and attentional skills are "intact" and that she "performed reasonably well on cognitive tasks on MSE" do not indicate any limitations in Plaintiff's ability to work. His assessment of moderate limitations in Plaintiff's cognitive and social abilities appears to result primarily from non-objective factors such as her depressive symptoms and her self-described social reclusiveness. Symptoms are not objective evidence as defined in C.F.R. § 404.1529(a).

**Residual Functional Capacity Hypothetical**

Plaintiff next contends that the ALJ erred in posing her hypothetical question concerning Plaintiff's residual functional capacity to the vocational expert. Specifically, Plaintiff alleges that the ALJ failed to include in her hypothetical specific work-related limitations due to

Plaintiff's depression after finding that Plaintiff suffered from depression (Tr. 23). The ALJ simply stated that Plaintiff was capable of "semi-skilled work." Plaintiff contends that the ALJ's use of the term "semi-skilled work," was too broad and instead needs to be expressed in terms of specific functional limitations that affect what Plaintiff can do in a work setting. This Court agrees with Plaintiff that the ALJ's stipulation that Plaintiff was capable of performing semi-skilled work was not supported by substantial evidence.

The ALJ's determination is flawed because she failed to "build a logical bridge" from her finding that Plaintiff suffered from depression and her determination that he was able to perform "semi-skilled work" without qualification.[2] In her evaluation of the evidence, the ALJ made several determinations indicating psychological impairment. Specifically, she found that Plaintiff had a moderate limitation of her activities of daily living, a mild limitation of social functioning, and a mild limitation of concentration, persistence, or pace (Tr. at 19). Coupled with the only psychological opinion evidence she credited – Dr. Peterson's report indicating that she was depressed and reclusive – her findings do not comport with the hypothetical question she posed. Young v. Barnhart, 362 F.3d 995, 1003 (7th Cir. 2004) ("Ordinarily, a hypothetical question to the vocational expert must include all limitations supported by medical evidence in the record.") (citing Steele v. Barnhart, 290 F.3d 936 (7th Cir. 2002)).

---

[2] In contrast to Plaintiff's assertion that the use of the term "semi-skilled work" is improper in the RFC hypothetical context, such a term has a specific and meaningful definition for vocational experts. "Semi-skilled work" is defined in 20 C.F.R. § 404.1568(b):

> Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

13

Further, the hearing transcript indicates that the vocational expert did not consider other evidence pertaining to Plaintiff's mental impairments outside of what was included in the hypothetical. "[W]here the hypothetical does not include all of the applicant's limitations, we must have some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations." Young, 362 F.3d at 1003; see also, Ehrhart v. Sec'y of Health and Human Servs., 969 F.2d 534, 540 ("When the record supports the conclusion that the vocational expert considered the medical reports and documents, his responses are probative of both residual functional capacity and which jobs a claimant can perform, even if the hypothetical question itself does not take into account every aspect of the claimant's impairments.").

During the hearing, the ALJ first asked hypothetical questions assuming Plaintiff could perform skilled or semi-skilled work. Then she asked whether there would be any jobs available for plaintiff, "assum[ing that she found] Claimant's testimony totally credible and all impairments described as supported by substantial medical evidence." This exchange clearly indicates the "all or nothing" nature of the questioning. The first set of hypotheticals were based on the premise that Plaintiff's testimony concerning the effects of depression as well as bipolar disorder was completely untrue, while the second hypothetical assumed that all of her testimony was accurate. The ALJ's finding that Plaintiff suffered from depression, however, appeared to take a middle ground between the extremes – in effect, a rejection of her bipolar diagnosis and acceptance of her depression. Therefore, it was error for the ALJ to rely on the vocational expert's testimony, which assumed Plaintiff's unqualified ability to perform semi-skilled work.

**Dr. Blaise's Divergent Evaluations**

Finally, Plaintiff claims that the ALJ erred in failing to adequately explain her acceptance of Dr. Blaise's June 2003 report, and her total rejection of his February 2005 opinion. A

14

comparison of the two reports and Dr. Blaise's treatment notes does not reveal any substantial worsening of the conditions listed in the letter dated August 12, 2003 (Tr. 356-71). But two new diagnoses appear in the February 2005 report—fibromyalgia and bipolar disorder. Although it is possible that Dr. Blaise's February 2005 opinion was based on a worsening of the conditions previously listed in 2003, this conclusion would not be supported by any objective medical evidence—signs or symptoms.

Plaintiff's new diagnosis of fibromyalgia is completely unsupported by objective medical evidence in the record. Besides muscle spasms, there are no signs or laboratory findings of how Plaintiff was diagnosed with fibromyalgia by Dr. Blaise. The Merck manual states that screening tests can differentiate fibromyalgia from hypothyroidism, and we have no record that these tests were ever done in Plaintiff's case. As the Seventh Circuit has stated:

> The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

Sarchet v. Chater, 78 F.3d 305, 306 (1996). The ALJ correctly pointed out that Dr. Blaise did not identify any of these trigger points. In fact, Dr. Blaise did not provide *any* laboratory findings or signs of fibromyalgia that could be observed apart from Plaintiff's statements. Rather, it appears that Dr. Blaise could have only made his diagnosis of fibromyalgia by either accepting Plaintiff's own claims that she was suffering from fibromyalgia or by taking the Cedar Court Community Clinic notes of "?fibromyalgia" as evidence that they had properly diagnosed Plaintiff with fibromyalgia. And in contrast to Dr. Gilbert's medical opinion above, this Court is satisfied that Dr. Blaise has provided all of his medical records and reports. Dr. Blaise's

15

rejection of Plaintiff's diagnosis of fibromyalgia appears to have been supported by substantial evidence.

But it is also possible that Dr. Blaise's February 2005 opinion on Plaintiff's ability to work could have been based on findings made by Dr. Gilbert regarding her diagnosis of Bipolar Disorder.  For this reason, we cannot fully resolve the issue of whether substantial evidence existed to support the ALJ's decision to grant no weight to Dr. Blaise's February 2005 opinion.  Upon remand, the ALJ should reconsider the weight to be granted Dr. Blaise's February 2005 opinion in light of medical records obtained from Dr. Gilbert.

## CONCLUSION

For the foregoing reasons, the final decision of the Commissioner of Social Security is **REVERSED** and this matter is **REMANDED** for proceedings consistent with this Order, with special instructions that the ALJ should further develop the record by obtaining the treatment notes and any other relevant medical records from Dr. Gilbert, which will allow the ALJ to determine the proper weight to be given to Dr. Gilbert's assessments.  The weight to be given Dr. Blaise's February 2005 opinion should then be reevaluated in light of these medical records obtained from Dr. Gilbert.

**DATED: March 28, 2007**

/s/ *Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**